BRYAN, Judge.
The Alabama Real Estate Appraisers Board (“the Board”) appeals from a judgment of the Randolph Circuit Court modifying an order of the Board disciplining Joshua M. Smith. We reverse and remand.
Smith is a certified residential-real-property appraiser. In 2006, Smith was acting as a “mentor appraiser” to Charles William Jaggers, who was licensed as a trainee real-property appraiser. Smith assigned Jaggers to appraise a property containing a single-family house (“the property”) located in Fruithurst. Jaggers conducted the work necessary for the appraisal, and he prepared the appraisal report (“the report”). Both Jaggers and Smith signed the report in November 2006, and the report lists Jaggers as the appraiser and Smith as the “supervisory appraiser.” As the supervisory appraiser, Smith certified in the report that he had directly supervised Jagger; that he agreed with the analysis, opinions, statements, and conclusions in the report; and that he accepted full responsibility for the contents of the report.
In August 2008, the Board received a complaint against Smith concerning the report, and the Board subsequently conducted an investigation. In August 2010, the Board filed an administrative complaint against Smith concerning the report. The complaint alleged that Smith had violated certain provisions of the Alabama Real Estate Appraisers Act, § 34-27A-1 et seq., Ala.Code 1975, and certain rules governing appraisers. The Board appointed a hearing officer to hold an evidentiary hearing, and the hearing officer held the hearing in October 2010. After receiving ore tenus and documentary evidence, the hearing officer issued a recommended order, which the Board adopted as its decision. The Board’s decision made extensive factual findings and concluded that Smith had violated various rules and statutory provisions governing real-estate appraisers; those findings and conclusions will be discussed in more detail below. The Board suspended Smith’s appraiser’s license for one month and levied against him an administrative fine of $5,000.
Smith appealed the Board’s decision to the circuit court. On August 25, 2011, the circuit court entered an order modifying the Board’s punishment of Smith by suspending his appraiser’s license for six months, fining him $2,500, and publicly reprimanding him. However, the circuit court’s order stayed the modified punishment of Smith for six months and permitted him to continue to work as an appraiser during that period. The order further stated: “At the end of the six (6) month period, if [Smith] has had no further findings by the Board, then the findings, conclusions, punishments and public reprimand of the [Circuit] Court as set out in this case will be DISMISSED.”[1] *525 (Capitalization in original.) On March 15, 2012, more than six months after its order was entered, the circuit court entered a judgment dismissing the case. Although the circuit court purported to simply dismiss the action appealing the Board’s decision, the circuit court actually modified the Board’s decision. We reach this conclusion by reading the March 15, 2012, judgment dismissing the ease together with the August 25, 2011, order that modified the Board’s punishment and then stayed the modified punishment for six months. By staying the modified punishment and then dismissing the case after the expiration of the six-month stay, the circuit court effectively negated the Board’s punishment of Smith and replaced it with a probationary period. The Board appealed the circuit court’s judgment to this court.
At the hearing, Samuel Davis, an investigator for the Board, testified that he had investigated Smith’s appraisal of the property. Davis’s testimony served as the primary basis of the Board’s findings. The Board found, in pertinent part:
“There were two discrepancies between data set forth in the report regarding the ... property and the actual state of the ... property. [Smith] argues that it is impossible for the Board to know the state of the ... property in 2006, [when the appraisal was conducted,] because [Davis,] the Board’s investigator[,] did not make his inspection until 2009. However, with respect to these two particular discrepancies, this argument is not persuasive for reasons that will be set forth herein. The discrepancies are as follows:
“... The report states that the ... property had two upstairs bedrooms .... The report contains a printed building sketch_ That sketch indicates that a closet exists in the outside corner of each of these bedrooms. [Davis], upon inspection, determined that there are no closets in these bedrooms. While he was unable to enter the structure, he was able to look through the windows. He also took photographs through the windows of the interior of these bedrooms. There were no closets in these corners. Additionally, from the exterior of the structure, he measured the wall length available on these corners for a closet. Windows are present on both walls close to the corners where these closets were supposed to have been located, which restrict the available space. The measurements taken from the outside by [Davis] indicate that only one foot, seven inches existed on the front measurement, and two feet 10 inches existed on the side wall measurement. This means that any sueh closet would be implausibly small. The only way to make a larger closet would be to obstruct the windows. Nevertheless, there is no indication in the photographs taken by [Davis] and, indeed, [Davis] observed no signs, that closets had ever been in these two corners. Indeed, [Smith’s working file contains] a hand sketch of the floor plan of this structure, which was probably made [in 2006, when the appraisal was conducted].... The sketch of the second floor shows two bedrooms, but shows that there are no closets. Additionally, [Smith] offered no reliable testimony to the effect that closets ever existed in these bedrooms. [Smith] never made an inspection of the ... property. Therefore, there are four bases for finding that no closets existed in the upstairs bedrooms [in 2006]. Those bases are (1) there was not enough room in these bedrooms for a closet to exist; (2) there *526 were no closets in 2009[, when Davis inspected the property,] and there was no physical indication that there had ever been any closets in these corners; (3) the hand sketch ... contained in [Smith]’s working file ... demonstrates that there were no closets in these bedrooms at the time the sketch was drawn; and (4) [Smith] did not submit any reliable testimony based on personal knowledge that closets did exist in these bedrooms in 2006. Therefore, [the Board] finds that [Smith] misrepresented in the report that closets existed in the upstairs bedrooms.
"... The report states that this property contained a central heating and central air conditioning [ (‘A/C’) ] system. The report indicates that there were two individual units which, presumably, meant that there were two central A/C compressors. However, the investigation of the Board determined that this house contained two window units and no central heating and air conditioning. Again, [Smith] argues that the Board’s inspection was made in 2009, three years after [Smith]’s report [was prepared], and that things could change in the structure in that time frame. However, [the Board] finds that there was no central heating and air conditioning in the ... property at the time of [Smith]’s inspection. When the Board made its inspection, there was absolutely no sign that central heating and air conditioning ever existed in this structure. The floors and the ceiling were visible and showed no signs of duct work or vents. There was no evidence that any ducts or vents ever existed in any part of the structure. [Smith] says that perhaps all evidence of a preexisting central heating and air conditioning system had been removed. However, based upon the condition of the house, such a conclusion is unwarranted. Further, there is no indication that a pad for a central heating and air conditioning unit was ever situated outside the structure. The only indication of heating and air conditioning in the structure are the two gravity units in the walls. [Smith] admits that he really does not know whether central heating and air conditioning ever existed in this structure because he did not inspect it. It is untenable to think that a central heating and air conditioning system existed in this structure. Therefore, [the Board] finds that [Smith] misrepresented in the report the fact that central heating and air conditioning existed [on] the ... property.
“... In addition to the two discrepancies, there are inadequacies or failures of [Smith] to properly prepare the report in accordance with the Uniform Standards of Professional Appraisal Practice [ (‘USPAP’) ] and there are other errors in the factual reporting. These are as follows:
“On Page 2 of 6 of the ... Report ... there is a block beside [the] ‘Sales Comparison Approach’ [category] labeled ‘Quality of Construction.’ The appropriate response to place in that block is an evaluation as to whether the ... property rates a fair, average, good, or some other similar designation. Instead of appropriately making the evaluation in this fashion, [Smith] indicated that the [quality of construction] was ‘vinyl siding.’ For the comparable[ properties] in the same block he indicated that they were brick/veneer siding, wood siding, and wood siding[2] These are inappro *527 priate designations, and do not comport with the requirements of USPAP.
“On Page 3 of 6 of the ... Report ... there is a block beside the designation ‘Cost Approach’ which reads ‘Quality Rating from Cost Service.’ In this block [Smith] stated that the rating was average. However, this is an incorrect rating for the ... property. As listed on the report, the source of this cost data is [the] Marshall and Swift residential estimator.[3] [Davis] testified with respect to the Marshall and Swift estimator.... [Davis] testified that the ... property fell within the fair quality range, not average. Whereas[] the Marshall and Swift fair quality criteria called for eight-foot interior ceilings, the ... property had two bedrooms with seven-foot interior ceilings. The fair quality criteria set forth therein lists ‘flat roof or low-pitch roof.’ The ... property had a low-pitched roof. The ‘fair’ criteria referenced ‘low-quality fixtures’ as a fixture count of ten or below. The ... property had only six fixtures. The ‘fair’ quality criteria included an owner-built (not professional) reference, and [Davis] determined, upon investigation, that some of the construction did indeed appear to be owner built. [Davis] found below-quality workmanship, which is another criteria under ‘fair’ quality construction. Indications of below-quality workmanship in the ... property include a wall-mounted heat pump with a large gap between the top of the heat pump and the wall; a countertop that does not fit properly, the lack of handrails on the stairs and very narrow stairs, a kitchen outlet with a hole in the sheetrock larger than the outlet cover, no doors on the downstairs closets, and outside drain pipes emptying into the yard. These conditions are not the type that would likely develop from poor maintenance or destructive [forces]. [The Board] finds that these conditions existed in 2006.
“[Smith] argued that there are certain features of the ... property that actually exceed the criteria for average quality. He also points out that the ... property meets or exceeds most of the average quality criteria in the Marshall and Swift estimator. In this regard, [Davis], who is himself a well-qualified Real Property Appraiser, and [Smith] disagree. The scales tip in favor of the Board’s position on this point by virtue of the following explanation.
“[Davis] examined Property Record Cards on the ... property and the three comparable[ properties]. The 2006 Property Record Card for the ... property lists the quality class as [‘] minus.[’] The Code definitions in the Alabama Department of Revenue’s Alabama Appraisal Manu[a]l ... state that E minus means ‘fair’ quality construction. The Department of Revenue has a classification code system for various levels of quality and uses plus and minus signs to indicate structures that fall between the classifications.... Class E describes a residence that might be considered slightly below average or fair. Class F is a low-cost or poor type of structure. An E minus indicates a less than below average property. The E minus means that the ... property should be rated as ‘fair’ quality construction. For all of the reasons set forth herein, the quality of construction of the ... property, using the cost approach, should have been identified as ‘fair,’ not average.
*528 “The report fails to [accurately] state the differences between the ... property and the comparable [properties]. There clearly are differences between the property and the comparable [properties], but [Smith] reported that there were no differences in certain material aspects. For example, on Page 2 of 6 of the report ... under [the category entitled] Sales Comparison Approach, in the heating/eooling block [Smith] states that all four properties have central heating and cooling. This is simply not true. Additionally, under [the] Functional Utility [block], [Smith] reports that all of the properties are average. This is clearly incorrect as will be further set forth herein. In the ... Report, Page 2 of 6 ... under [the category entitled] Sales Comparison Approach, the block entitled ‘Condition’ describes all of the properties as average. Again, this is not correct. Additionally, there is no adjustment for differences in the ages of the properties. Some comment should have been made with respect to these differences. [Smith] reported the ... property virtually throughout [the report] at a higher classification than warranted when comparing the [property] to the comparable[ properties].
“As set forth in [the] paragraph [directly] above, the functional utility of the ... property is listed as average. This evaluation does not comport with the actual status of the property. The layout of the ... property is inferior to the layout of the comparable [properties]. Two upstairs bedrooms in the ... property without closets and the lack of an upstairs bathroom causes the bedrooms to be functionally obsolete. In fact, it is quite arguable that the two upstairs bedrooms should not have been listed as bedrooms at all. Further, the floor plan is functionally obsolete. All of the comparable [properties] had two bathrooms and the ... property had only one. The floor plan of the ... property required that a person in an upstairs bedroom traverse a narrow set of stairs with no hand rail through either the kitchen or one of the downstairs bedrooms to get to the only bathroom in the house. [Davis] testified that none of the comparable [properties] suffered from functional obsolescence. Two of the comparable [properties] were ranch-style houses with all rooms on one floor.
“Further, [Smith] did not address functional obsolescence in his cost[-]approach [assessment], [Smith] should have used a method calculated to account for functional obsolescence. For example, [Smith] could have used a cost-to-cure factor in his analysis, [ie., analyzing how much it would cost to cure the functional obsolescence,] but did not do so.
“... Had [Smith] not allowed the discrepancies referenced herein, and had [Smith] not failed to comply with the [USPAP], there would have been a different outcome in this appraisal.
“... [Smith] denied any wrongdoing. He stated that he did not observe the ... property. However, his failure to inspect is irrelevant to the issues herein regarding the propriety of the report for which he was responsible.
“[Smith] gave his opinions with regard to various aspects of the criticisms offered by [Davis] to the effect that he is right about all analysis performed and data reflected in the report. Many of these opinions have been previously addressed in this Order. Clearly, however, [Smith]’s opinions in these regards do not warrant much weight.
*529 “... [Smith] argues that a public reprimand or a suspension would harm him financially. This is certainly a consideration; however, it cannot be determinative of the issues and the ultimate [decision by the Board].”
Based on these findings, the Board found that Smith had violated six rules of the Uniform Standards of Professional Appraisal Practice (“USPAP”): (1) USPAP Rule 1-1 (a), which requires an appraiser to correctly employ recognized methods and techniques that are necessary to produce a credible appraisal; (2) USPAP Rule 1-1(b), which prohibits an appraiser from committing a substantial error, omission, or commission that significantly affects an appraisal; (3) USPAP Rule l-4(a), which requires an appraiser to analyze available comparable-sales data to indicate a value conclusion when a sales-comparison approach is necessary; (4) USPAP Rule 1-4(b)(ii), which requires an appraiser to analyze available comparable-cost data “to estimate the cost new of the improvements” when a cost approach is necessary for credible results;[4] (5) USPAP Rule 1-4(b)(iii), which requires an appraiser to analyze available comparable data “to estimate the difference between the cost new and the present worth of the improvements” when a cost approach is necessary for credible assignment results; and (6) USPAP’s Ethics Rule prohibiting an appraiser from “communicatfing] assignment results in a misleading or fraudulent manner” or “communicatfing] a misleading or fraudulent report or knowingly permitting] an employee or other person to communicate a misleading or fraudulent report.”
The Board also explicitly punished Smith under four provisions of § 34-27A-20(a)(6)-(9), AlaCode 1975. Under that statute, the Board may revoke a license, suspend a license, or levy a fine for:
“(6) Violation of any of the standards for the development or communication of real estate appraisals as provided in this section.
“(7) Failure or refusal without good cause to exercise reasonable diligence in developing an appraisal, preparing an appraisal, in preparing an appraisal report, or in communicating an appraisal.
“(8) Negligence or incompetence in developing an appraisal, in preparing an appraisal report, or in communicating an appraisal.
“(9) Willfully disregarding or violating this chapter or the regulations of the board for the administration and enforcement of this chapter.”
In reviewing a decision of an administrative agency, such as the Board, this court’s standard of review is the same as that of the circuit court. Alabama Dep’t of Envtl. Mgmt. v. Legal Envtl. Assistance Found., Inc., 973 So.2d 369, 375 (Ala.Civ.App.2007). Section 41-22-20(k), Ala.Code 1975, governs our review and the circuit court’s review of the Board’s decision in this case. In pertinent part, it provides:
“(k) Except where judicial review is by trial de novo, the agency order shall be taken as prima facie just and reasonable and the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions *530 of fact, except where otherwise authorized by statute.... The court may reverse or modify the decision or grant other appropriate relief from the agency action ... if the court finds that the agency action is due to be set aside or modified under standards set forth in appeal or review statutes applicable to that agency or if substantial rights of the petitioner have been prejudiced because the agency action is any one or more of the following:
“(1) In violation of constitutional or statutory provisions;
“(2) In excess of the statutory authority of the agency;
“(3) In violation of any pertinent agency rule;
“(4) Made upon unlawful procedure; “(5) Affected by other error of law;
“(6) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
“(7) Unreasonable, arbitrary, or capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.”
Our review of the Board’s conclusions of law and its application of the law to the facts is de novo. Ex parte Wilbanks Health Care Servs., Inc., 986 So.2d 422, 425 (Ala.2007).
The circuit court offered no explanation for its decision to modify the Board’s punishment of Smith. By effectively reducing the punishment, the circuit court evidently determined that the punishment was too severe. Before discussing whether the Board’s punishment of Smith was too severe, we will first examine the Board’s determination of Smith’s culpability. As presented thoroughly in the Board’s decision, the Board heard Davis’s testimony indicating that Smith had violated six USPAP rules and four statutory provisions regarding the conduct of appraisers. “A presumption of correctness attaches to the decision of an administrative agency due to its recognized expertise in a specific, specialized area.” Hall v. Alabama Alcoholic Beverage Control Bd., 631 So.2d 1047, 1048 (Ala.Civ.App.1993). The Board’s findings in this case clearly involve the Board’s “expertise in a specific, specialized area.” Id. Although Smith disputed some of Davis’s opinions, it was within the Board’s authority to weigh the disputed evidence. A reviewing court “shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact, except where otherwise authorized by statute.” § 41-22-20(k). There is no indication that the Board’s determinations regarding Smith’s appraisal fall into any of the categories found in § 41 — 22—20(k)(1)—(7) that would allow the circuit court to modify the Board’s decision. Based on Davis’s testimony and the deference given to the Board, we cannot say that the Board erred in determining that Smith violated the various rules and statutory provisions cited in the Board’s decision.
Further, the Board’s punishment of Smith does not fall into any of the categories found in § 41 — 22—20(k)(l)—(7) that would allow the circuit court to modify the Board’s decision in punishing Smith. We specifically note that the Board’s punishment of Smith is authorized by statute. The Board suspended Smith’s license for one month and levied against him an administrative fine of $5,000. Section 34-27A-20(a) permits the Board to, among other things, “suspend the [appraiser’s] license” and “levy fines as provided in subsection (c)” for violations enumerated in § 34-27A-20(a). In turn, subsection (c) of § 34-27A-20 provides: “In addition to the disciplinary powers granted in subsection (a), the board may levy administrative fines for serious violations of this chapter *531 or the rules and regulations of the board of not more than $500 for each violation.” Regarding “the rules and regulations of the board,” § 34-27A-23, Ala.Code 1975, provides that “[a] licensed real estate appraiser shall comply with the current [US-PAP] approved by the board.” The Board has promulgated Rule 780-X-13-.01, Ala. Admin. Code (Alabama Real Estate Appraisers Board), which adopted the parts of the USPAP applicable in this case as rules governing appraisers. Thus, under § 34-27A-20(a), the Board was authorized to suspend Smith’s license for one month. Under § 34-27A-20(a) and (c), the Board was also authorized to fíne Smith $500 for each serious violation under § 34-27A-20(a) and the USPAP rules. The Board determined that Smith had violated 4 statutory provisions under § 34-27A-20(a) and 6 USPAP rules, for a total of 10 violations. Thus, at $500 per violation, the Board was authorized to fíne Smith $5,000 for the 10 violations. Accordingly, the Board had the statutory authority to levy the $5,000 fine in this case.
In sum, the Board acted within its discretion in punishing Smith, and the circuit court erred in modifying the Board’s decision. Based on the foregoing, we reverse the circuit court’s judgment, and we remand the case to the circuit court for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
PITTMAN, THOMAS, and MOORE, JJ., concur.
THOMPSON, P.J., concurs in the result, without writing.

. The parties dispute whether the order of August 25, 2011, was a final judgment. Because that order did not finally resolve the issue of Smith's punishment, that order was not a final judgment. " ‘It is well established that a final judgment is a "terminal decision which demonstrates there has been a complete adjudication of all matters in controversy between the litigants.” ’ " Williams Power, Inc. v. Johnson, 880 So.2d 459, 461 (Ala.Civ.App.2003) (quoting Dees v. State, 563 So.2d 1059, 1061 (Ala.Civ.App.1990), quoting in *525 turn Tidwell v. Tidwell, 496 So.2d 91, 92 (Ala.Civ.App.1986)).

. The report lists three "comparable sale” properties and compares them to the property in several categories.

. Davis testified that “Marshall and Swift” "is an evaluation-cost evaluation service that appraisers use to do reproduction cost when they're estimating reproduction cost in [using] the cost approach [analysis] on appraisals.”

. It is unclear what the Board’s decision means when referencing “improvements” in the context of the USPAP rules. When referencing this particular USPAP rule, the Board explains that "[Smith] priced out the house with central heating and air conditioning when the house actually had wall heat pumps.” Presumably, the wall heat pumps were considered the actual "improvements” on the house that were not properly considered.